**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )    Criminal No. 20-218 |
| ROBERTO EGURROLA-VASQUEZ, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION</u>**

Presently before the Court is the Government's motion pursuant to 18 U.S.C. § 3145(a)(1) seeking revocation of a release order issued by United States Magistrate Judge Erik J. Markovich in the District of Arizona, which is opposed by Defendant Roberto Egurrola-Vasquez.  (*See* Docket Nos. 127, 465, 475).  After careful consideration of the parties' positions, review of the detention hearing transcript, the referenced Pretrial Services Report, and additional evidence received at the hearing held on January 11, 2021, (Docket Nos. 475-1, 484, 524, 524-1, 524-2, 524-3, 524-4, 524-5), the Government's motion will be granted and detention will be ordered.  In addition to the reasons stated on the record at the January 11th hearing, the following includes the Court's findings of fact and additional statement of the reasons for detention as required by 18 U.S.C. § 3142(i)(1).

I.      **<u>BACKGROUND</u>**

    A.  **<u>PROCEDURAL HISTORY</u>**

On August 25, 2020, Defendant and 26 other co-defendants were charged in Count One of the Indictment in this case with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846, for conduct occurring from in and around October 2018 until in and around June 2020.  (Docket No. 3).  An arrest warrant was issued for Defendant on that same date.  (Docket No. 17).

As outlined in the Government's motion, Defendant surrendered to the United States Marshals Service in the District of Arizona on September 3, 2020, he had an initial appearance there and was ordered to be detained pending a detention hearing.  (Docket No. 127 at 2). Following a hearing held on September 10, 2020,  Magistrate Judge Markovich denied the Government's request that Defendant be detained pending trial and ordered his release on an unsecured personal recognizance bond with conditions.  (Docket Nos. 227-5, 225-6).  At the Government's request, Magistrate Judge Markovich stayed the release order until 5 p.m. PST that day to permit the Government to file a motion to revoke the release order.  (Docket No. 227-5).

On September 10, 2020, the Government filed with this Court an emergency motion for a stay and revocation of the release order pursuant to 18 U.S.C. § 3145(a)(1).  (Docket No. 127).  In sum, the Government represented that Defendant "is subject to a rebuttable presumption in favor of detention.  He is unable to rebut it.  The charges against him are serious, his involvement in the conspiracy was significant, and the weight of the evidence is strong.  Defendant's drug-trafficking activity represents his only tie to the Pittsburgh area, where this case is pending.  [Defendant's] release would pose a serious danger to the community.  It would also give rise to an intolerable risk of flight, which could be aided by several conspirators who have thus far managed to evade law enforcement." (*Id.* at 10-11).  On that same date, this Court granted the Government's motion as to its request that the release order be stayed and further ordered that Defendant shall remain in the custody of the United States Marshals Service and be transported forthwith to the Western District of Pennsylvania for further proceedings on the Government's request that he be detained pending trial or other disposition.  (Docket No. 129).

Following Defendant's arrival in this District, he was arraigned on December 10, 2020 and pled not guilty to the charge.  (Docket Nos. 421, 423).  In response to the Court's order directing

the parties to file a status report, the parties indicated that they wished to submit briefs on the Government's motion to revoke the release order, proposed a briefing schedule which the Court adopted, and Defendant requested a hearing which was held by video conference on January 11, 2021.  (Docket Nos. 451, 459, 526).

On December 22, 2020, the Government filed a memorandum in support of its motion to revoke the release order, pointing out that the rebuttable presumption of pretrial detention applies and the relevant factors in 18 U.S.C. § 3142(g) mandate detention.  (Docket No. 465 at 17-23).  In support, the Government maintains that it has strong evidence demonstrating that Defendant was part of an elaborate, multi-national drug trafficking organization ("DTO") responsible for distributing more than 100 kilograms of cocaine obtained from a source of supply in Mexico and sold by its members operating in Pennsylvania, California, Arizona and other states.  (*Id.* at 6, 18).  As for Defendant's role, the Government submits that he was responsible for the transportation of multi-kilogram quantities of cocaine on behalf of the DTO's Mexican source of supply and its Los Angeles based distributors, co-defendants Manuel Silvestre and Johnny Bravo.  (*Id.* at 18).  As such, the Government contends that Defendant is both a danger to the community given the serious nature of the drug trafficking offense and a flight risk because he has no ties to the Western District of Pennsylvania, he faces a substantial penalty if convicted and he may seek refuge in Mexico, where he routinely travels.  (*Id.* at 20, 22-23).  Along with its memorandum, the Government submitted six exhibits, which will be discussed in detail below.  (Docket Nos. 524, 524-1, 524-2, 524-3, 524-4, 524-5).

On December 23, 2020, Defendant filed a memorandum in support of release, alternatively arguing that the "presumption for detention should not apply . . . as he was not a member of the conspiracy as it applies to him in the Western District of Pennsylvania" and that "he has rebutted

the presumption of detention and has satisfied the criteria for release."  (Docket No. 475 at 3, 8).

Defendant attached to his memorandum a letter from William Terrazas and Adan Vazquez of

Arizona Restoration Experts LLC, indicating that the company will hire him to work full time and

a letter from his brother, Cesar A. Egurrola, offering to serve as a third-party custodian if he is

released.  (Docket No. 475-1).

### B.  <u>EVIDENCE ADDUCED AT THE HEARING</u>[1]

At the January 11th hearing, the Government presented testimony by Drug Enforcement

Administration Special Agent ("SA") Michael Johns, who is one of the lead agents in the

investigation of this case.[2]  SA Johns' testimony was based on his personal knowledge, including

his review of Title III wiretap intercepts, and information relayed to him by other investigating

agents.  Through SA Johns' testimony, the Government entered into evidence the following six

exhibits: (1) an excerpt from an Affidavit in Support of an Application for an Order Authorizing

the Interception of Wire and Electronic Communications by SA Christopher J. Kline of the United

States Postal Service – Office of Inspector General ("Govt. Ex. 1"); (2) an Application, Affidavit

and Order dated April 16, 2020 authorizing the disclosure of geolocation data for cellular telephone

number (520) 370-3695 ("Govt. Ex. 2"); (3) a group exhibit consisting of draft transcriptions of

intercepted communications on January 28, 2020 among Silvestre, an individual identified as "El

Plebe," a female known as "Maria," and an unidentified individual known as "T" or "Joe,"

Defendant's Arizona commercial driver's license and Defendant's California identification card

---

1  An official transcript of the hearing has not been produced as of this date.  Therefore, the Court summarizes
the testimony presented from its notes of the proceeding and by reference to the exhibits admitted into evidence.

2  SA Johns testified that during his career with the DEA which began in 2002, he has participated in
investigations ranging from street-level drug dealing to high level narcotics trafficking, as well as Title III wiretap
investigations, and he is familiar with communication modes and methods utilized by DTOs.  In this Court's
estimation, SA Johns presented as an experienced agent and, based on his demeanor and testimony in response to the
questioning of the attorneys, he offered credible testimony concerning the investigation of this case.

("Govt. Ex. 3"); (4) a draft transcription of a series of intercepted telephone conversations on May 1 and 2, 2020 among El Plebe, Silvestre, Bravo and Defendant ("Govt. Ex. 4"); (5) a photograph of cocaine seized on May 5, 2020 ("Govt. Ex. 5"); and (6) United States Customs and Border Protection records pertaining to Defendant for the time period from January 1, 2018 until August 21, 2020 ("Govt. Ex. 6").  (Docket Nos. 524, 524-1, 524-2, 524-3, 524-4, 524-5).

By way of background, SA Johns explained that the investigation focused on the trafficking of cocaine from Mexico into the United States, including Los Angeles, California and Pennsylvania.  (Docket No. 524, ¶ 37).  Relevant here, wiretaps were utilized on nine Target Telephones ("TT") during the period from November 2019 until June 2020.  Based on information set forth in Govt. Ex. 1,[3] the Court authorized the interception of communications over TT #1 and TT #4 utilized by co-defendant Jamaal Maragh and TT #5 and TT#9 used by co-defendant Manuel Silvestre.  (Id., ¶ 39, 43).  Maragh was identified as the main operative for the DTO in the Pittsburgh area, and he frequently travelled to Los Angles to obtain cocaine which had been procured for him.  (Id., ¶¶ 38, 41).  Silvestre was a high-ranking member of the DTO based in Los Angeles and was responsible for coordinating the distribution of kilogram quantities of cocaine and collecting the associated drug proceeds.  (Id., ¶ 43).  During the wiretap investigation, agents also intercepted calls involving UM2517 (also known as "T", "Joe" and "Loco"), who SA Johns testified was a source of supply to the DTO located in Mexico.  (Id., ¶ 44).

SA Johns testified that the DTO's distribution operation used tractor trailers to transport cocaine from Mexico into the United States to the Los Angeles area.  From there, the cocaine was transported to other locations, including the Western District of Pennsylvania, by utilizing tractor trailers or shipping it through the United States postal system.  According to SA Johns, Defendant

---

3       SA Johns adopted Govt. Ex. 1 as part of his testimony.

and co-defendants Ramon Araiza-Vega, Antonio Egurrola-Gamboa and Justo Parra were truck drivers who transported cocaine for the DTO.

SA Johns testified that Defendant's involvement in the DTO was discovered as a result of a series of communications on January 28, 2020 intercepted over Silvestre's telephone as set forth in Govt. Ex. 3.  (*See* Docket No. 524-2).   In the first intercepted call between Silvestre and UM6987, identified as El Plebe, the two discussed the need to contact "Maria" in order to determine how to proceed with the process for "Gordito." (*Id.* at 2).  In a subsequent call, Silvestre inquired with Maria (whose last name was unknown) as to how the "truck process" was going, and Maria explained that "this guy" did not provide her with the appropriate documents, such as a recent paid utility bill, in order to secure licensure for him.  (*Id.* at 3-4).   After receiving that information, Silvestre advised El Plebe that he had spoken with Maria, who indicted that "Gordito" had not provided her with the appropriate documents for her to complete his licensure.  (*Id.* at 5-6).  Silvestre then followed-up with another call to Maria concerning Gordito, who Maria referred to as "Roberto," and Silvestre asked Maria to text him with Roberto's full name, address and driver's license.  (*Id.* at 7).  In response, Maria sent Silvestre text messages containing pictures of an Arizona commercial driver's license for Roberto Egurrola Vasquez at an address in Tucson and a California identification card for Roberto Egurrola Vasquez at an address in Riverside, California.  (*Id.* at 9-17).  According to SA Johns, as a result of these intercepted communications, agents suspected that Defendant was the individual referred to as Gordito. As SA Johns further testified, agents suspected that Defendant was a courier for the DTO based on another intercepted call on January 28, 2020 between Silvestre and the Mexican source of supply during which Gordo was referenced, and Silvestre described his efforts to obtain truck licensure for him.  (*Id.* at 18-21).

6

SA Johns next testified concerning Govt. Ex. 4, which is a series of intercepted calls on May 1 and 2, 2020 among El Plebe, Silvestre, Defendant and co-defendant Johnny Bravo, who was a courier/distributor of narcotics and related proceeds for the DTO in Los Angeles.  (Docket Nos. 524, ¶ 42; 524-3).  In a call on May 1st, El Plebe informed Silvestre that "El Gordito will arrive to where you are in the morning with some stuff. . . . He's bringing ten." (*Id.* at 2).  According to SA Johns, this expression indicated that Defendant was going to deliver ten kilograms of cocaine to Silvestre the next morning.  In that same call, El Plebe indicated that Defendant already was on his way and he would tell Defendant to call Silvestre.  (*Id.*).  On the morning of May 2nd, Defendant, using telephone number (520) 370-3695,[4] called Silvestre to advise that he was arriving and Silvestre asked if the meeting location was "[w]here I met with you last time." (*Id.* at 3).  In a follow-up call shortly thereafter, Defendant specified that he was not at the location where the two previously met and he sent Silvestre his current location.  (*Id.* at 4).

SA Johns testified that later in the morning on May 2, 2020, agents intercepted a call during which Silvestre directed Bravo to contact Lupita, later identified as co-defendant Lucien Burton, in order to deliver narcotics to him.  (Docket No. 524-3 at 5).  Silvestre told Bravo that Burton "has it for six," and instructed Bravo to "check the money for the six, if he has the money for the ten, first check the money . . . ." (*Id.*).  In a subsequent call on the afternoon of May 2nd, Bravo advised Silvestre that he was "[h]ere with Lupita," and Silvestre directed Bravo to count carefully, stating that "[a]t 25,600.  If you want to multiply it by ten, then put it in, okay?" (*Id.* at 7).  SA Johns testified that the reference to 25,600 was significant because it represented the price per

---

4       SA Johns testified that he reviewed Govt. Ex. 2, which is an application, affidavit and order to receive geolocation data for telephone number (520) 370-3695, (Docket No. 524-1), and adopted it as part of his testimony.  As set forth in Govt. Ex. 2, agents determined that Defendant utilized telephone number (520) 370-3695, which was registered to his wife, Edith Egurrola, at his address in Tucson, Arizona.  (*Id.* at 12-14).

kilogram of cocaine which also had been referenced during an intercepted call between Maragh and the Mexican source of supply.  (*See* Docket No. 524, ¶ 78).  SA Johns further explained that Silvestre's direction to multiply by ten was a reference to the price for ten kilograms of cocaine. Finally, SA Johns explained that Silvestre's and Bravo's discussion on May 2nd referencing ten kilograms of cocaine is consistent with the May 1st conversation during which El Plebe informed Silvestre that Defendant would be "bringing ten."  (Docket No. 524-3 at 2).

SA Johns next testified concerning a call intercepted on May 4, 2020 between Maragh and UM2517 (the unidentified Mexican source of supply) during which they discussed a multi-kilogram cocaine transaction, with UM2517 ultimately informing Maragh that he could supply Maragh with 25 kilograms of cocaine.  (Docket No. 524, ¶¶ 44, 81, 82).  In a subsequent intercepted call on May 4th between Silvestre and El Plebe, the two discussed the logistics of when that cocaine would arrive.  (*Id.*, ¶¶ 83, 84).  El Plebe informed Silvestre that Defendant, who he referred to as El Gordito, was "loading up" "right now" and would "arrive over there" tomorrow, and they also discussed that there would be an exchange between Silvestre and the truck driver.  (*Id.*, ¶¶ 83, 84). Based on this call, SA Johns testified that agents believed Defendant was going to transport cocaine to Los Angeles on May 5th.  In a later call on May 4th, El Plebe informed Silvestre that Defendant, again referred to as El Gordito, and another truck driver would each transport 13 kilogram of cocaine, for a total of 26 kilograms.  (*Id.*, ¶¶ 85, 86).  El Plebe further informed Silvestre that he would receive two boxes containing the cocaine from one truck driver.  (*Id.*, ¶ 86).

On May 5, 2020, agents intercepted a call between Silvestre and UM3695, later determined to be Defendant, (*see supra*, n.4), during which they discussed that the exchange of kilograms of cocaine and United States currency would occur later that morning at a location the co-conspirators had historically utilized.  (Docket No. 524, ¶¶ 87, 88).  In another call on the morning of May 5th,

8

Defendant advised Silvestre that he would give the box of cocaine that he was going to transport to the other driver, and Silvestre would receive both boxes (each containing approximately 13 kilograms of cocaine) from the other driver.  (*Id.*, ¶¶ 89, 90).  In a subsequent call that morning, Silvestre asked Defendant to have the other driver, who was determined to be Araiza-Vega, contact him directly.  (*Id.*, ¶¶ 91, 92).

After that, agents intercepted a call from Araiza-Vega to Silvestre, during which Araiza-Vega indicated that he would be at the meeting location in approximately 15 minutes.  (Docket No. 524, ¶¶ 93, 94).  Agents conducting surveillance subsequently observed Silvestre pull behind Araiza-Vega's tractor-trailer and saw the two men meet.  (*Id.*, ¶ 97).  Agents observed two boxes being loaded into Silvestre's vehicle and Araiza-Vega received a box from Silvestre that was placed in the cab of his tractor-trailer.  (*Id.*).  After law enforcement detained Araiza-Vega and Silvestre, a search of Silvestre's vehicle revealed 26 kilograms of cocaine contained in the boxes, while a search of Araiza-Vega's tractor-trailer uncovered $160,000 in United States currency. (*Id.*).  SA Johns testified that Govt. Ex. 5 is a photograph of the 26 kilograms of cocaine which was seized from Silvestre's vehicle on May 5, 2020.  (*See* Docket No. 524-4).

Finally, SA Johns testified that Govt. Ex. 6 is a record of Defendant's inbound travel from Mexico to the United States compiled by United States Customs and Border Protection, which shows that he made 70 trips from Mexico to the United States during the period from January 1, 2018 through August 21, 2020.  (Docket No. 524-5).

Defendant presented testimony by his brother, Cesar Egurrola, who is willing to serve as a third-party custodian, but he indicated on cross-examination that he was not proposing that Defendant live with him.  According to Mr. Egurrola, Defendant's wife is in possession of his passport and will make it available to Defendant's counsel.  Defendant also proffered his wife as

a third-party custodian, as well as the Pretrial Services Report's recommendation of release pending trial.

After reviewing the transcript of the detention hearing before Magistrate Judge Markovich, considering the Pretrial Services Report, the supplemental information and evidence presented at the hearing and the arguments of counsel, the Court concludes, for the reasons stated at the hearing and further detailed here, that there is no condition or combination of conditions which will reasonably assure Defendant's appearance as required and the safety of the community if he is released.

## II.   <u>LEGAL STANDARD</u>

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (the "BRA"), governs release and detention pending judicial proceedings. Pursuant to 18 U.S.C. § 3145(a)(1), "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release. . . ." A district court exercises *de novo* review over a release order entered by a magistrate judge.[5] *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). A district court may incorporate the transcript of the proceedings before the magistrate judge, as this Court did at the January 11th hearing.[6] *See United States v.*

---

[5] Although the Court held a hearing in this case, it is well-established that "[d]e novo review does not require an additional evidentiary hearing[,]" and the district court "may make its independent determination based solely upon the evidence introduced at the prior hearing." *United States v. Kolonis*, No. 2:20-cr-0146, 2020 WL 5253192, at *3 (W.D. Pa. Sept. 3, 2020) (quoting *United States v. Burgess*, No. 2:09-cr-150, 2009 WL 2038148, at *2 (W.D. Pa. July 8, 2009)); *see also United States v. Bastianelli*, Crim. No. 17-305, 2018 WL 1015269, at *4 (W.D. Pa. Feb. 22, 2018) ("The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record.").

[6] In addition to incorporating the transcript of the detention hearing before Magistrate Judge Markovich, the Court also incorporated an audio recording of the arraignment hearing held on December 10, 2020 before Magistrate Judge Kelly, which defense counsel provided to the Court via email prior to the January 11th hearing. Defendant

*Chagra,* 850 F. Supp. 354, 357 (W.D. Pa. 1994).  The Court "may also consider any additional evidence or proffers submitted in conjunction with any supplemental proceedings," which it has done here.  *Burgess*, 2009 WL 2038148, at *1 (citation omitted).

As noted, the availability of pretrial release is controlled by the BRA, which provides that a defendant must be released on his personal recognizance or upon execution of an unsecured appearance bond unless the court determines that "such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b).  Following a hearing, if the judicial officer finds that no condition or combination of conditions of release will reasonably assure the defendant's appearance and the safety of the community, detention must be ordered.  18 U.S.C. § 3142(e)(1). In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the judicial officer must consider the § 3142(g) factors concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

---

referred to the audio recording in his briefing, contending that it shows he played a minor role as a courier in the alleged conspiracy.  (Docket No. 475 at 5).  Ultimately, the defense did not play the audio recording or otherwise rely on it at the January 11th hearing.

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Certain cases raise a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3). This rebuttable presumption applies to cases, among others, in which there is probable cause to believe that the defendant committed an offense under the Controlled Substances Act, 21 U.S.C. § 801, *et seq*., for which the maximum term of imprisonment is ten years or more. 18 U.S.C. § 3142(e)(3)(A). An indictment charging a defendant with committing an offense enumerated in § 3142(e)(3) is sufficient to establish probable cause triggering the rebuttable presumption. *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

A defendant may rebut the presumption in § 3142(e) by producing "some credible evidence . . . that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). The defendant's burden of production is relatively light and has been construed as easy to meet.[7] *Chagra*, 850 F. Supp. at 357 (citation omitted). If rebutted, however, the presumption does not disappear but rather "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Id.* at 358 (citation omitted). If the defendant rebuts the presumption, the burden

---

[7]     To rebut the presumption that the defendant presents a danger to the community, "he must come forward with some credible evidence that he will not continue to engage in the drug activities with which he has been charged." *Chagra*, 850 F. Supp. at 358 (citations omitted). This may be accomplished through "'testimony by co-workers, neighbors, family physician, friends, or other associates concerning the arrestee's character, health, or family situation.'" *Suppa*, 799 F.2d at 120 (quoting *United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1986)).

of persuasion remains with the Government.  *Id.* at 357.  Thus, the Government bears the burden

of proving that the defendant presents either a risk of flight or a danger to the community.[8]

## III.   DISCUSSION

As an initial matter, Defendant is charged in Count One of the Indictment with conspiracy

to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which carries a

penalty of not less than ten years and up to life imprisonment.  *See* 21 U.S.C. § 841(b)(1)(A)(ii).

Accordingly,  there is a rebuttable presumption in this case that no condition or combination of

conditions will reasonably assure Defendant's appearance as required and the safety of the

community.  *See* 18 U.S.C. § 3142(e)(3)(A).

Defendant initially argued in his briefing that the presumption should not apply because

"he was not a member of the conspiracy as it applies to him in the Western District of

Pennsylvania," "arrangements for the drug shipments were made outside [his] purview and . . . he

was not privy to these conversations or arrangements," "he was merely used as a tool between

others," and he only played a minor role in the conspiracy as a courier.  (Docket No. 475 at 3, 4-

5).  Defendant further argues that there is no evidence that he knew the arrangements between

Silvestre and Maragh, that he ever met with Maragh or that he travelled to this District.[9]  (*Id.* at 4).

These arguments do not persuade the Court that the presumption does not apply.

To reiterate, the rebuttable presumption applies to cases in which there is probable cause

---

8       The Government must prove by a preponderance of the evidence that the defendant is a flight risk and that
no condition or combination of conditions will assure his appearance at trial.  *United States v. Himler*, 797 F.2d 156,
161 (3d Cir. 1986).  The Government must prove by clear and convincing evidence that the defendant is a danger to
the safety of any other person or the community.  *Delker*, 757 F.2d at 1399.

9       Defendant's arguments on these points are misplaced.  As the Third Circuit Court of Appeals has explained,
the Government may prove the elements of a drug conspiracy by circumstantial evidence, and it "need not prove that
each defendant knew all of the conspiracy's details, goals, or other participants."  *United States v. Gibbs*, 190 F.3d
188, 197 (3d Cir. 1999); *see also United States v. Claxton*, 685 F.3d 300, 305 (3d Cir. 2012) ("[A] finding of guilt in
a conspiracy case does not depend on the government introducing direct evidence that a defendant was a knowing
participant in the conspiracy; circumstantial evidence can carry the day.").

to believe that the defendant committed an offense under the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, for which the maximum term of imprisonment is ten years or more.  18 U.S.C. § 3142(e)(3)(A).  As in this case, an indictment charging a defendant with committing such an offense is sufficient to establish probable cause triggering the rebuttable presumption.  *Suppa*, 799 F.2d at 119.  Therefore, the rebuttable presumption applies.

Defendant attempts to rebut the presumption by proffering evidence of the following: he has significant ties to the community in Tucson, Arizona where his immediate family resides, he has no criminal history or substance abuse problem, and he was gainfully employed prior to this case.  (Docket No. 475 at 6-7).  Additionally, Defendant proffered a letter from Arizona Restoration Experts LLC, as a prospective employer who is willing to hire him if he is released. (Docket No. 475-1).  Finally, Defendant's brother wrote a letter and testified that he is willing to serve as a third-party custodian for him, Defendant proffered that his wife is also willing to serve as a third-party custodian, and he further suggested that an electronic monitoring condition can be imposed if he is released.  (*Id.*; Docket No. 475 at 7).

Even if Defendant's proffered information and evidence satisfies his burden to rebut the applicable presumption, the Court nonetheless concludes that the Government has presented clear and convincing evidence that Defendant is a danger to the safety of the community and has proven by a preponderance of the evidence that he is a flight risk.  In reaching these decisions, the Court has conducted an independent examination of the record as a whole and balanced the four factors set forth in 18 U.S.C. § 3142(g).  For reasons that follow, the Court finds that the available information and evidence on each of those factors weigh in favor of detention.

A.  <u>**Nature and Circumstances of the Offense Charged**</u>

The Government submits that this case arises from the investigation of a DTO which was

14

responsible for distributing more than 100 kilograms of cocaine that was obtained from a source of supply in Mexico and sold by members of the organization in Pennsylvania, California, Arizona and other states.  (Docket No. 465 at 6).  The conspirators accomplished this by using the United States mail to ship kilogram quantities of cocaine and drug proceeds and by driving tractor-trailers carrying narcotics across the border and to various states for distribution.  For Defendant's part, he was one of the truck drivers who allegedly transported multi-kilogram quantities of cocaine. As a result of Defendant's alleged involvement, he has been indicted on a charge of conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which is a very serious controlled substance offense.  (Docket No. 3).  If convicted, he faces a statutory mandatory term of not less than 10 years and up to life imprisonment.  In light of this, the nature and circumstances of the offense charged weigh strongly in favor of pretrial detention.

### B.  <u>Weight of the Evidence</u>

As a general matter, the Court observes that the weight of the evidence against Defendant is strong, as reflected by the grand jury's return of the  Indictment which establishes probable cause that the offense occurred.  More specifically, while Defendant is presumed innocent of the charged offense, the Government's evidence strongly suggests that Defendant was not only involved in the conspiracy, but he played an important role in the DTO as a courier of significant quantities of cocaine.

As part of the investigation, the DEA intercepted communications pursuant to Title III wiretaps among the conspirators indicating that they referred to an individual known as Gordito who was ultimately identified as Defendant through his driver's license and identification card. Other intercepted communications show that Silvestre undertook efforts to ensure that Defendant received the proper truck licensure, and his discussion of that matter with the Mexican source of

supply suggests that Defendant was involved in transporting narcotics for the DTO.  To that end, additional intercepted communications among El Plebe, Silvestre, Bravo and Defendant (who utilized a telephone number that agents determined was registered to his wife) suggest that Defendant delivered ten kilograms of cocaine to Silvestre on May 2, 2020, which Bravo then distributed to Burton and collected payment for same.  Additionally, the Government's evidence shows that Defendant worked in conjunction with Araiza-Vega, another truck driver, to effectuate the delivery of 26 kilograms of cocaine to Silvestre on May 5, 2020, which had been ordered by Maragh.  Law enforcement detained Araiza-Vega and Silvestre when they met to exchange the cocaine and drug proceeds, and a subsequent search of their vehicles revealed 26 kilograms of cocaine and $160,000.  Overall, the Government possesses significant evidence of Defendant's involvement in the DTO, particularly as to the events of May 2020.  In sum, while recognizing that Defendant is presumed innocent of the charged offense, the weight of the evidence against him favors pretrial detention.

**C.  History and Characteristics of Defendant**

As to Defendant's background and characteristics, he is 32 years old, he was born and raised in Magdalena De Kino, Sonora, Mexico, he relocated to Tucson, Arizona in 2004, where he has remained since, and he later became a naturalized United States citizen.[10]  Defendant's mother and one sibling are legal permanent residents who reside in Tucson, and his father and three other siblings are United States citizens who also reside in Tucson.

---

10      Defendant's background, residence, family ties, employment history, physical and mental health, substance abuse history and criminal history are described in the Pretrial Services Report prepared in the District of Arizona. The Court notes that neither party has objected to the contents of this Report relative to Defendant's history and characteristics as detailed therein.

Defendant and his wife, Edith Egurrola, who is a legal permanent resident, have been married for nine years, and they have two children, ages 18 and 6.  Defendant has resided with his family at his current address in Tucson for two years.

 To Defendant's credit, he does not have any criminal history.  He is in good physical and mental health, and he does not have any current substance abuse issues.

 Defendant previously was employed as a truck driver for WS Truckline for three years until he left that position to begin working for Soto Trucking.  He was only with Soto for one week before self-surrendering in this case.  Although Defendant's solid employment is commendable, it is troubling that he appears to have used his occupation as a truck driver in furtherance of a serious drug trafficking offense.  As noted, Defendant has submitted a letter from Arizona Restoration Experts LLC, a company which provides residential remodeling services, indicating that it would hire him full time if he is released.

As for financial responsibilities, Defendant has an outstanding mortgage of $160,000, he owes $30,000 on his vehicle financing and he has credit card debt of $1,000 according to him and $10,000 according to his wife.  Defendant's monthly expenses include $1,240 for his mortgage, $600 for utilities, $250 for a cell phone, $600 for food, $640 for vehicle financing, $200 for auto insurance and $50 for credit card debt, or a total of $3,580 in monthly expenses.  Although the Court recognizes that Defendant has a prospective employment opportunity, it is also cognizant of his significant monthly financial obligations, which raise some concern that he could be tempted to return to the drug trafficking activity with which he has been charged.

As to community ties, it is appropriate to consider whether a defendant has ties to the district where the prosecution is pending.  *See United States v. Bucio*, Crim. No. 5:17-055-DCR, 2019 WL 4397334, at *3 (E.D. Ky. Sept. 13, 2019) (the defendant's lack of any community,

financial, family or employment ties to the district where prosecution was pending weighed in favor of revoking release order); *United States v. Villegas*, No. 3:11–CR–28, 2011 WL 1135018, at *7 (E.D. Tenn. Mar. 25, 2011) ("[A]lthough the defendant has ties with the community in which he lives in California, the defendant has no ties with this District, and the Court may consider this fact.") (citing *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (finding that "community" embraces ties to the community in which the charges are brought and the community in the United States to which the defendant has ties)); *United States v. Rivera*, 90 F. Supp. 2d 1338, 1343 (S.D. Fl. 2000) (observing that a court should consider a defendant's ties to the community in which he faces prosecution).  In this case, Defendant has no ties whatsoever to the Western District of Pennsylvania where this case is pending.

The Court recognizes that Defendant has long-standing ties to Tucson, Arizona and his immediate family members currently live there.  Despite Defendant's ties to that community, the Court cannot discount that he also has family ties to Mexico, as the Pretrial Services Report indicates that he reported travelling to Mexico bi-weekly to visit family.  Records from United States Customs and Border Protection show that he traveled from Mexico to the United States a total of 70 times in the period from January 1, 2018 to August 21, 2020.  (*See* Docket No. 524-5).  In this Court's estimation, 70 international trips in approximately 2½ years qualify as frequent international travel.  While the Court understands that individuals who live in close proximity to the border may travel to Mexico to shop, dine and vacation, the Court agrees with others which have held that frequent international travel, in conjunction with other relevant factors, supports a finding that an individual is a flight risk.  *See e.g., United States v. Yusuf*, Crim. No. 4:19-CR-271-SDJ, 2020 WL 607105, at *6 (E.D. Tex. Feb. 7, 2020) (concluding the defendant was a flight risk because he represented his travel as infrequent but he had taken at least thirteen international trips

in the past four years, which the court observed cannot be accurately described as "infrequent" travel "[b]y any metric"); *United States v. Ortiz*, Crim. No. 11-251-08, 2013 WL 247226, at *7 (E.D. Pa. Jan. 23, 2013) (concluding that a defendant charged with serious drug offenses who lived in Puerto Rico and traveled to Mexico on three separate occasions in the eighteen months preceding his arrest was a flight risk). Here, Defendant's frequent international travel, in conjunction with his lack of any ties to this District and the substantial term of incarceration he faces if convicted, cause this Court to conclude that he presents a flight risk.

The Court recognizes and appreciates that Defendant's brother and his wife are willing to serve as a third-party custodian for him, but has serious concerns about such an arrangement, regardless of who would assume that role. Although Defendant's brother and wife are surely well-intentioned, the mere fact that they are willing to serve as a third-party custodian does not mean that they, or anyone else, could adequately supervise a defendant who is charged with an extremely serious drug trafficking offense. *See United States v. Bey*, Crim. No. 15-87, 2015 WL 7176340, at *5 (W.D. Pa. Nov. 13, 2015) ("[T]he mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case.").

The Court also recognizes that it must consider all possible conditions of release, such as electronic monitoring as suggested by Defendant. As discussed, Defendant allegedly was connected with a DTO involving more than 100 kilograms of cocaine and large sums of drug proceeds and, at 32 years old, he is now exposed to a minimum term of ten years' imprisonment. In light of the nature of the charged conspiracy and the substantial penalty Defendant faces if convicted, this Court is not persuaded that any amount of bond, electronic monitoring or other

means of personal supervision would deter him from fleeing.  *See Chagra*, 850 F. Supp. at 359-60 (given that the defendant faced minimum term of 20 years' imprisonment on drug conspiracy charge, the conspiracy involved large sums of cash, and evidence suggested that he had contacts in Mexico related to his illegal drug activities, the court was not satisfied that any possible conditions of release would reasonably assure the defendant's appearance, as "[e]lectronic monitoring and other means of personal supervision . . . only notify authorities that the defendant is already fleeing").

Overall, when considering Defendant's history and characteristics (most notably, no ties to the Western District of Pennsylvania, frequent international travel and employment status/financial obligations), this factor weighs in favor of pretrial detention.  *See e.g., United States v. Ruiz-Corral*, 338 F. Supp. 2d 1195, 1198 (D. Colo. 2004) (concluding defendant was a flight risk and revoking magistrate judge's release order, despite that defendant was a United States citizen, had no prior felony convictions, was described as a "dutiful employee" who held a job for five years, had ties to the community and agreed to post his home as security for the bond to secure his appearance, where he was indicted for serious drug conspiracy and weapons charges and had significant family ties to Mexico).

## D.  <u>Nature and Seriousness of Danger to Any Person or the Community if Released</u>

The final factor requires consideration of the nature and seriousness of danger to any person or the community if Defendant is released.  As to this factor, the Court recently explained in the case of one of Defendant's co-conspirators that:

> [it] agrees with others which have observed that drug trafficking poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of a dangerous, addictive drug such as cocaine as alleged to have occurred here.  *See Bastianelli*, 2020 WL 1015269, at *8 ("Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very

dangerous and addictive drugs [ ]."); *United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007) ("[V]iolence is not the only danger to the community this court must consider. The court must also consider the danger of trafficking in illicit drugs."). Distribution of Schedule II controlled substances like cocaine have a "high potential for abuse" and that abuse "may lead to severe psychological or physical dependence." *See Bastianelli*, 2018 WL 1015269, at *8 (citing 21 U.S.C. § 812(b)(2)(A), (C)). Accordingly, the high volume of cocaine allegedly trafficked in this case presents a considerable danger to the safety of the community.

Ultimately, consideration of this factor requires a court to "*predict* whether defendant will engage in drug trafficking if released pending trial." *United States v. Bratcher*, Crim. No. 14-28, 2014 WL 1371582, at *8 (W.D. Pa. Apr. 8, 2014) (emphasis in original) (citing *Perry*, 788 F.2d at 114 ("[T]he dangerousness determination involves a prediction of the detainee's likely future behavior."). The Court recognizes, as others have, that strict conditions of release, including conditions such as home confinement and electronic monitoring, cannot guarantee that a defendant will no longer engage in criminal activity. *See e.g.*, *Bastianelli*, 2018 WL 1015269, at *8 (citing *United States v. Yarbough*, No. 2:14-cr-270-11, 2014 WL 7343839, *4 (W.D. Pa. Dec. 23, 2014) ("If released to home detention, nothing prevents Defendant from continuing to engage in illegal activity.").

*United States v. Araiza-Vega*, Crim. No. 20-218, 2020 WL 6546136, at *8 (W.D. Pa. Nov. 6, 2020).

These observations concerning the substantial risk of harm to the community posed by cocaine trafficking equally apply in Defendant's case. All told, based on the serious nature of the charge here, along with all of the other factors the Court has considered, the Court finds that the weight of the evidence is such that Defendant's release on bond would pose a serious risk of his continued drug trafficking activities. As such, this final factor weighs in favor of pretrial detention.

In sum, after considering the record as a whole, including the nature and circumstances of the serious drug offense charged, the weight of the evidence against Defendant, his history and characteristics, the nature and seriousness of danger to the community posed by Defendant's release, and the rebuttable presumption, which retains evidentiary weight, there is no condition or set of conditions which will reasonably assure that Defendant will not engage in drug trafficking

activity while on release pending trial or that he will appear as required.  Accordingly, detention must be ordered.

**IV.** <u>**CONCLUSION**</u>

Given the Court's finding that no condition or combination of conditions will reasonably assure Defendant's appearance as required and the safety of the community if he is released, the Court will lift its stay of the order of release entered by Magistrate Judge Markovich in the District of Arizona on September 10, 2020, grant the Government's motion seeking revocation of the release order, revoke Defendant's bond and order that he shall be detained pending trial or other disposition of this matter.

An appropriate Order follows.

<u>*s/ W. Scott Hardy*</u>
W. Scott Hardy
United States District Judge

Dated: January 19, 2021

cc/ecf:  All counsel of record
        United States Marshal